## In re THOMAS C. DAVIS, Petitioner.

### No. 10853.

1. LEGISLATIVE INVESTIGATING COMMITTEE — under Senate concurrent resolution 26, Legislature of 1897, had power to sit after adjournment of Legislature. The committee appointed under Senate concurrent resolution No. 26, providing for a committee, composed of two Senators and three members of the House of Representatives, to investigate charges of bribery, etc., has power to sit after the adjournment of the Legislature and carry on the investigation. (Doster, C. J., concurring.)

2. ———— ch. 132, Laws 1891, does not confer power on, to imprison witness. Chapter 132 of the Laws of 1891, does not confer on investigating committees appointed by the Senate and House of Representatives valid power to imprison witnesses who refuse to appear or testify before such committees. (Johnston, J., concurring; Doster, C. J., dissenting.)

Original proceedings in habeas corpus. Opinion filed June 5, 1897. Petitioner discharged.

At the last session of the Legislature, the following concurrent resolution was passed by both houses as senate concurrent resolution number 26 :

"Whereas, Certain charges of bribery and the use

of improper influence having been made from time to time for the purpose of influencing the members of the House of Representatives and Senators, to vote for or against certain measures, bills and resolutions pending in the Legislature for passage at the present session ; and

" Whereas, Charges of this nature have been made by reputable citizens of the State of Kansas and by Senators on the floor of the Senate, and the said charges involve the moral standing and reputation of all members of the present Legislature : therefore, be it

"*Resolved by the Senate, the House concurring therein,.* That a committee of five, to consist of three members of the House of Representatives, and two members of the Senate, to be appointed by the speaker of the House and president of the Senate, respectively, that said committee have power to appoint a sergeant-at-arms, clerk and stenographer, to send for persons and papers and to fully investigate all charges of bribery, attempted bribery or other improper conduct in connection with the business of the present Legislature or any of the members thereof, by any person, firm or corporation whatsoever."

The resolution was passed by the Senate on March 2, and by the House on March 3. In pursuance of said resolution, the President of the Senate appointed Senators M. A. Householder and A. S. Cooke as members of the committee on the part of the Senate, and the Speaker of the House appointed Representatives O. O. Outcalt, Lot Ravenscraft and F. E. Grimes as members on the part of the House. On the fifth of March the committee met, and organized by electing O. O. Outcalt chairman, and F. E. Grimes secretary, and appointed Frank R. Forrest sergeant-at-arms. At a meeting of the committee held on March 19, it was decided to again meet on April 6, to begin taking testimony in accordance with the resolution. The Legislature adjourned *sine die* on March 20. The

committee again met on the sixth of April and pro-
ceeded to take testimony, adjourning from time to
time, until the twenty-seventh of April, when the pe-
titioner, Thomas C. Davis, who had been duly sub-
pœnaed to testify as a witness and who had testified
at some length, refused to answer certain questions
pertaining to the subject of the investigation.    A war-
rant was thereupon issued, signed by four of the mem-
bers of the committee, directed to Frank Forrest as
sergeant-at-arms, commanding him to take the peti-
tioner into his custody, and imprison him until he
should consent to answer the questions propounded.
On the application of Davis, a writ of *habeas corpus* was
issued, and he was brought before the court for in-
quiry into the legality of his detention.

*David Overmyer* and *D. R. Hite*, for the petitioner.

*L. C. Boyle*, Attorney General, and *G. C. Clemens*,
for the respondent.

ALLEN, J.    Two principal questions are presented
for determination.    The first is, whether the commit-
tee appointed under Senate concurrent resolution No.
26 has authority to act after the adjournment of the
Legislature ; the second is, whether it has power to
imprison a witness for refusal to testify.    The general
rule undoubtedly is that the powers of committees of
legislative bodies cease on the final adjournment of
the body, unless express provision is made for their
continuance ; but that the houses of the Legislature
have power to confer authority on a
committee to continue its labors after
adjournment, is not questioned.    The
concurrent resolution under which the
committee claims the right to act contains no direction
on the subject ; and if the question were to be deter-
mined solely on the resolution itself, it would follow

1. Legislative com-
mittee had power
to sit after ad-
journment of
Legislature.

that the committee is without power to proceed. But paragraph 95 of the act making appropriations for miscellaneous purposes, reads at follows :

" There is hereby appropriated, three thousand dollars to pay expenses of committee officers, clerks, stenographers, witnesses and other necessary expenses incurred in an investigation for bribery as recited in Senate resolution No. 26, or so much thereof as may be necessary : *Provided*, That said sum shall not be available if criminal prosecution shall be instituted in the District Court of Shawnee County on or before May 15, 1897 ; *and provided further*, That said investigation shall terminate when said sum of three thousand dollars shall be expended under penalty of forfeiture to the State treasury of the whole sum herein appropriated, and no part of this sum shall be available until the investigation shall be terminated and the aggregate expense submitted to the Auditor of State under oath of the committee of investigation ; no mileage shall be paid in excess of five cents per mile, and the Auditor of State is hereby authorized to draw his warrants upon the Treasurer of State upon properly authenticated and detailed vouchers for the purposes above named in accordance with the conditions hereinbefore stated and when approved by the chairman of said committee."

This act was approved March 15, and appears as chapter 11 of the Laws of 1897. The clause quoted lacks much of 'being clear or explicit, but it seems to contemplate a session of the committee after the fifteenth of May, rather than before, and evidences intent on the part of the two houses that the committee should sit after final adjournment.

The right of the committee to proceed with the investigation being upheld, the second question, namely, as to the power of the committee to punish a witness as for a contempt in refusing to answer, remains to be decided. It is not contended on behalf of the respondent that the committee is a court, nor that it

2. Committee has no power to imprison witness. would be competent for the Legislature to confer on any other officials that kind of judicial power which the Constitution says shall be conferred on courts. But the contention is that some judicial power resides in the Legislature, and that some judicial power, other than that properly appertaining to courts, may be conferred wherever the Legislature in its wisdom sees fit. It is not asserted that the Constitution does not make a valid and effectual division of the powers of government into executive, legislative and judicial departments, nor is the wisdom of such a division of powers questioned ; nor has there been any suggestion in the brief or on oral argument that such a division is unreasonable or illogical. It has been generally, if not universally, accepted as the best and safest division of powers yet devised by man, and is recognized as firmly established by all writers on the Constitution. Story on the Constitution, vol. 1. chapter 7 ; Cooley's Constitutional Limitations (6th ed.), 46. The essential features of the arrangement are comprehended and approved by all classes of citizens. The Legislature enacts general rules for the guidance of all departments of the government. It levies taxes and directs the expenditures of the money raised thereby, but it executes no law. The judiciary declares the law, and directs as to its application to controversies that arise. It expounds and makes plain that which is obscure and ambiguous so far as it is able to do so. The fundamental law embodied in the Constitution binds all departments of the government and fixes the limits of their powers. To its mandates all must yield obedience ; for it is superior to any and all agencies created under it. It is the warrant of authority from the people to all those placed in official position and exercising the powers it delegates ; and

when called on to declare what the law is in a case pending, it would seem to need no argument in support of the proposition that the Constitution has force and authority superior to any legislative enactment; for the Legislature itself must look to the Constitution for its authority to act. Wherever there is a clear attempt on the part of the Legislature to transcend the powers entrusted to it by the Constitution, the courts must, of necessity, determine and declare that the fundamental law must be obeyed rather than the unwarranted act of the Legislature. This is well settled. The executive department of the government is the active force that gives effect to the laws enacted by the Legislature and to the decisions of the courts. It, like the other departments, must obey first of all the fundamental law. It alone is authorized to employ force, and, when duly authorized so to do, to seize the person or the property of the citizen. It is against the abuse of executive power that the citizen most needs protection, and it is here that the courts become most valuable, and stand as guardians of the people's rights, requiring every official who deprives a citizen of his liberty to show his authority under the law for so doing. The power of the courts is not exercised by the judicial officers in person, but must always require the aid of an executive officer. Its efficient exercise rests solely on the authority and binding force given to the decisions of the courts by the Constitution, and the general concensus of public opinion.

The petitioner is restrained of his liberty. He asks that he may be discharged from that restraint. He is entitled to that discharge unless the respondent can show lawful authority for his restraint. Bill of Rights, §§ 1, 18. It will not be contended for a moment that the Legislature has general power to imprison citizens, or that any one may impose a sentence

of imprisonment except in accordance with due process of law. Due process of law, ordinarily if not universally, means a trial and conviction in a court of justice in accordance with established forms. Executive officers may not seize and imprison a citizen except in the prescribed manner, and in connection with the due administration of justice in the courts. The only exceptions to this rule arise from the exercise by the houses of the Legislature of certain limited functions, judicial in their nature and expressly confided to them by the Constitution, and a single implied power to protect themselves, in the discharge of their legislative functions, by punishment as for a contempt. It is not claimed, however, that the petitioner has ever been brought before the bar of either the Senate or the House of Representatives and declared guilty of a contempt of the body; but the warrant of commitment is signed by four of the five members of the legislative committee appointed under the concurrent resolution above copied. The commitment is, therefore, not for a contempt of a legislative body, declared to be so by the body itself, but for a contempt of a legislative committee, declared to be so by that committee. Is this an attempted exercise of judicial power, or of legislative power ? Counsel for respondent concede that it is judicial power, but insist that it is not that kind of judicial power mentioned in section 1 of article 3 of the Constitution, which reads :

"The judicial power of this State shall be vested in a Supreme Court, district courts, probate courts, justices of the peace, and such other courts, inferior to the Supreme Court, as may be provided by law ; and all courts of record shall have a seal to be used in the authentication of all process."

It is not claimed, and could not with reason be urged, that the committee which issued this warrant is a court; for, under the provision of the Constitu-

tion just quoted, courts must be created by law. This committee was created, not by a law, passed by both houses of the Legislature in accordance with the forms prescribed in the Constitution and submitted to the Governor for his signature, but by a mere concurrent resolution, containing no enacting clause, not read on separate days, as a law must be, not entitled, as the Constitution requires a law to be, and never presented to the Governor for his approval. The act relied on as conferring authority on the committee to punish as for a contempt, is chapter 132 of the Laws of 1891; section 1 of which reads as follows:

"Any committee appointed by the Senate and House of Representatives of this State to investigate the conduct of any officer, board, committee, or department of State, or any other matter, shall have the power to issue subpœnas in the name of the State, to compel the attendance of witnesses from any part of this State, the production of any book or papers, and generally shall have the same power with reference to procuring testimony bearing upon the subject-matter under investigation as the district court would have in any case on trial in such court."

This act does not purport to create tribunals of any kind, but to confer powers on all committees thereafter appointed; and by the fourth section it is made to apply to a committee appointed by the House of Representatives at the session of the Legislature at which the act was passed. The case of *People v. Learned* ( 5 Hun [N. Y.], 626 ), much relied on by counsel for respondent, is very different in its facts. There, the Governor, with the advice and consent of the Senate, had, under a joint resolution, appointed commissioners to investigate the affairs of the canals of the State. After the appointment of the commissioners, none of whom were members of the Legislature, an act of the Legislature was passed in due form, which appears as

chapter 91 of the Session Laws of 1875, in express terms conferring on that identical commission, then in existence, the power to issue subpœnas, and, in case of the failure of a witness to obey a subpœna, to issue an attachment to the sheriff requiring him to attach the body of the witness and bring him before the commission ; and providing for like proceeding thereupon as if such commission were a court of record and such witness had been duly subpœnaed to attend before it. Although the commission in that case was appointed by the Governor under a concurrent resolution, which the court held was customary in that State, its powers were conferred by a special law, regularly enacted in the constitutional manner. In this case, there is merely a committee of the Legislature, and there could be no direct reference in the law to this particular committee, for it was not called into existence until six years after the passage of the act under which the power to commit is claimed. The powers exercised by the New York commission were, by a law duly enacted, directly conferred on the existing commission. We see no reason why judicial powers might not be conferred by direct legislative enactment on a commission already in existence. This case is wholly different. The legislative committee comes into existence by force of a mere concurrent resolution. It then seeks to convert itself into a court by virtue of an antecedent law which did not, and in the nature of things could not, attempt to create this committee for any purpose. The section of the Constitution above quoted requires that the courts themselves be provided by law. Other sections of the Constitution give the Legislature the power to confer jurisdiction on the courts which are created in accordance with the provision of the Constitution. It is no more competent for the Legislature to delegate to one

or both houses of the Legislature the power to make courts, than it is to so delegate the power to fix their jurisdiction and authority. In each case, the Legislature itself must act. It may create the court and define its powers by a single act, or it may create the court by one act and define its powers by another act or other acts.

Something is said with reference to the supremacy of the Legislature unless restricted by express constitutional provision. If this supremacy be conceded, it is supremacy in making laws ; supremacy in the exercise of legislative functions. Certainly it has no supreme executive or judical power. In the case of *In re Gunn* (50 Kan. 155) it was not doubted by counsel for either party, or by any member of the court, that the court had power to inquire into the legality of Gunn's restraint. The divergence of opinion in that case was as to the scope of the inquiry. The commitment was by the House of Representatives itself, not by a committee, and it was treated on all hands as settled law that the House might punish for a contempt of its authority.

In recent cases the question as to the power of the Legislature to authorize officers other than courts to punish as for contempts, where directly conferred in explicit terms, has been considered and denied. In the case of *In re Sims* ( 54 Kan. 1 ), it was held, that '' paragraph 2543 of the General Statutes of 1889, so far as it attempts to confer on county attorneys the power to commit witnesses for contempt on account of a refusal to be sworn, or testify, as provided in this section, is unconstitutional and void.'' In the recent case of *In re Huron* (ante, p. 152, 48 Pac. Rep. 574 ), decided by this court, as at present constituted, on April 10, 1897, it was held, Mr. Justice Johnston dissenting, that '' a notary public has no power to commit for contempt a

witness who, having been duly subpœnaed before him for that purpose, refuses to be sworn or to give his deposition ; and the statute purporting to confer such power upon him is invalid.'' In each of these cases, the statutes in express terms conferred the power which was attempted to be exercised. This court held the statutes void and the Legislature powerless to confer on persons other than courts judicial power to imprison as for a contempt of their authority. In the case before us, although there is a strong implication of a purpose to confer authority on legislative committees to punish as for contempt, no explicit authority is given. The language used is, that they shall have power to issue subpœnas to compel the attendance of witnesses, the production of books and papers, and, generally, have the same power with reference to procuring testimony as the district court would have in a case on trial in such court. It may well be held that witnesses are bound to obey subpœnas issued by the committee, and to testify, equally as if they were required to attend and testify before a district court; yet it does not necessarily follow that the Legislature has conferred authority on the committee to punish. Extension of the power to punish is not to be inferred, but must be clearly expressed. It is held that the sole power of the Federal courts to punish for contempt is derived from the statute. Works's Courts, 499, and cases cited. That a proceeding to punish as for a contempt is essentially criminal in character, is not only settled by a long line of decisions in this State (*In re Sims*, supra, and cases there cited ), but is almost, if not quite, universally recognized. 4 Encyc. of Pleading and Practice, 766, and cases cited. Under the cases cited, it is clear that the committee which issued the warrant in this case was never invested by act of the Legislature with the powers of a court, and that an attempt to re-

pose judicial power in a committee of the Legislature, as such, must be ineffectual. The claim that a judgment of imprisonment as for a contempt is not an exercise of judicial power, is sufficiently answered by the proposition that it is essentially a punishment for an offense against the public.

That legislative bodies have the power to enforce obedience to their rules of order and to compel witnesses to give testimony upon matters calling for legislative action, though sometimes questioned, is well established, and should be regarded as the settled law. Story on the Constitution, vol. 1, § 846, *et seq.*; Cooley's Constitutional Limitations (6th ed.), 158, *et seq.*; *Anderson v. Dunn*, 6 Wheat. 204; *In re Flavey*, 7 Wis. 630; *Ex parte McCarthy*, 29 Cal. 395; Cushing's Law and Practice of Legislative Assemblies (9th ed.), § 655; *In re Gunn*, 50 Kan. 155. The power to punish as for a contempt resides in the houses separately; and, while a refusal to testify before a committee duly appointed is a contempt of the house appointing such committee, and may be by it punished as such, the committee has no implied power to punish, and can only report the conduct of the offending party to the house for its action. Cooley on Constitutional Limitations, 161. The power to punish as for a contempt is not expressly given to the houses of the Legislature by the Constitution, but is taken by implication because necessary to the independence and integrity of these bodies. The limits of the power so implied are not clearly marked. They arise from necessity, and cannot extend beyond the limits of necessity. 2 Bishop's Criminal Law, § 250. The extent of the punishment to be inflicted, while resting in the discretion of the legislative body imposing it, has never been held to extend beyond fine and imprisonment; and where imprisonment is imposed, it has always been held to terminate

with the session of the legislature. *Anderson v. Dunn*, supra; Story on the Constitution, § 849. The power to imprison the citizen is not to be lightly implied. Generally speaking, authority for its exercise must be conferred in clear terms.

That the Legislature may confer on courts the power to imprison for an offense against the law, is undoubted. It is also clear that the refusal of a witness to testify before a legislative committee may be made an offense punishable by fine and imprisonment. *Chapman v. United States*, 5 Appeal Cases (D. C.), 122. *In re Chapman*, 17 Sup. Ct. Rep. 677. It cannot be said that the act of 1891 creates, or attempts to create, courts of any kind. Nor does it attempt to confer powers on courts to be thereafter established. Its terms clearly contemplate that the powers mentioned are intended to be conferred on committees of the houses of the Legislature as arms of the legislative department of the government, and not as parts of the judicial system. May the Legislature confer on a committee the power to punish recusant witnesses, not judicially, but as a branch of the legislative department of the government? The claim that it might do so would be, indeed, a novel one. The houses of the Legislature are vested with the law-making power of the State. The Constitution expressly authorizes the Legislature to confer on tribunals transacting the county business of the several counties powers of local legislation, and also to make provision by general law for the organization of cities, towns, and villages, and to restrict their powers. Aside from the special cases in which legislative powers are expressly allowed to be delegated, the Legislature itself must exercise the legislative functions. Its power to punish for contempt of its authority comes as an incident to its powers of legislation. Neither

the Senate nor the House can delegate to a committee any legislative power. It may use committees to collect information, and to aid it in many ways, but the power of final action and decision rests with the house. The limits of the power of a legislative body to punish for contempts are not to be determined absolutely by it. It was held by the Supreme Court of the United States, in *Kilbourn v. Thompson* (103 U. S. 168), that the power of the House of Representatives to force witnesses to testify with reference to a particular matter, and to commit for disobedience of its orders, was subject to review by the court; and that where an attempt was made to investigate a matter merely of private concern, the House had no power to compel a witness to testify. It is said in the syllabus of *Interstate Commerce Commission v. Brimson* (154 U. S. 447, 448):

" The inquiry whether a witness before the commission is bound to answer a particular question propounded to him, or to produce books, papers, etc., in his possession and called for by that body, is one that cannot be committed to a subordinate administrative or executive tribunal for *final* determination. Such a body could not, under our system of government, and consistently with due process of law, be invested with authority to compel obedience to its orders by a judgment of fine or imprisonment."

To hold that a committee of the Legislature may be given unrestricted power to punish for contempts, is equivalent to saying that the committee, which is a mere branch and arm of the law-making body, may exercise greater power than the house itself possessed. After the adjournment of the Legislature, the Senate and House of Representatives became dormant. Their powers have utterly ceased, for the time being, and those of the House of Representatives are completely at an end, unless the Governor sees fit to con-

vene the Legislature in extra session. The members of the House cannot, of their own volition, again convene. The House can neither take further legislative action nor exercise any function whatever. While the terms of Senators extend past another regular session of the Legislature, the Senate has no more power, until again regularly convened, than the House. But the committee, if authorized to sit in vacation, may adjourn from time to time. The resolution under which this committee was appointed contains no limitation on the time during which the committee is authorized to act, nor does it, in terms, provide for any report, or final action of any kind, on the part of the committee. It would seem that such a committee, if authorized to commit to prison, would have power to continue the imprisonment for an indefinite period, until it might finally dissolve or the terms of office of its members expire. The active powers of the House of Representatives ceased on the twentieth of March. It cannot be that the House, the authority of which to imprison ceased on the twentieth of March, might, merely by the appointment of a committee, perpetuate in that committee power to imprison until another Legislature should be chosen. This would be a delegation, by the House to a committee, of powers which the House does not possess. As an incident to its legislative functions, the power to punish for contempt ceased with the cessation of the legislative powers of the House, and a mere arm extended for the purpose of gathering information certainly cannot hold that power after it has ceased to exist in the body itself.

The conclusion reached is, that, while the committee may lawfully sit and take testimony, and while the refusal of a witness to answer proper questions propounded by the committee is a contempt of the

houses of the Legislature, which might be punished by the Senate or House of Representatives in case the Legislature should be convened in special session, the act of 1891 is insufficient to confer on the committee the power to imprison a witness for refusal to answer questions.

The petitioner will be discharged.

Johnson, J., concurring in the second proposition of the syllabus and in the order discharging the petitioner.

Doster, C. J. (dissenting). I dissent from the order discharging the petitioner, and dissent from all that has been said by Mr. Justice Allen in his opinion denying the power of the legislative committee to vindicate itself by an order of commitment. The prisoner's contention in this case constitutes a striking instance of the latter-day tendency to minimize the power of the legislative branch of the government and extend and magnify that of the judiciary. It has become the fashion for persons unwilling to subject themselves to the wholesome provisions of legislative authority to rush to the courts with a plea of persecution, and, in the name of some theory of popular right, demand immunity from the restraint imposed. So frequently have the judges yielded to the importunities of this class, that the fact of this being a government of delegated legislative power is becoming obscured in the popular mind, and its place usurped by a fancy, nebulous and indistinct, but fast outlining and shaping itself, that the judiciary is the final and supreme authority, sitting in censorship and correction over the other branches of government. "Government by injunction," "government by *habeas corpus*" and "government by the courts" are really losing those contemptuous and protesting significations with which

the terms were first used, and are rapidly passing into accepted theories of municipal sovereignty. Like an infection which through lack of preventive measures may develop into a type of permanent constitutional disease, the virus of this heresy has so inoculated the body politic as to endanger the very life of the organic political system. Even in this State, only four years ago, a majority of the judges of this court gravely assumed the right to compose a legislative dispute as to who were qualified to sit as members of one of the houses; and this, not upon any theory of constitutional interpretation, but by the might of forces drawn out of that vast and cavernous reservoir of authority called "judicial power." Later, a probate judge of one of the counties of the State swelled out the inconsequence of his office to a point of contact with the supreme executive head of the State, and actually had the temerity to issue an order restraining the Governor, as Commander in Chief, from mustering a militia company out of the service; and this court, instead of resting its denial of his right to do so upon the clear ground of distinction between the co-ordinate branches of government and their independence one of another, as it should have done, degraded the question into one of mere statutory construction and official practice. Instances of which the above are characteristic are constantly occurring in both State and Federal courts; and, in my judgment, an imperative duty rests upon the judiciary to disavow in emphatic terms the extravagant measure of authority so frequently ascribed to it.

It is now too late, for any effective purpose, to deny the right of the courts to sit in judgment upon acts of the Legislature. Accumulated precedent has established such right beyond the questioning of one judge or even of many judges. If, however, it

were an open inquiry, I should have no hesitation in denying the existence of the jurisdiction assumed. No close student of the structure, history and philosophy of the Government but will agree that the exercise of such power was not within the design of the framers of either State or Federal constitutions. The question whether such power should be conferred by express provision was debated in the Constitutional Convention of 1787. Propositions to confer it were repeatedly brought forward and as often put aside without decision. Finally, the one introduced by Mr. Madison was put to a vote, and received the approval of Delaware, Maryland and Virginia, only; Mr. Dickinson, during the course of the debate, epitomizing the objection to the scheme in the pithy observation that "the justiciary of Aragon became by degrees the lawgiver." It never thereafter, during the sessions of the Convention, became a subject of discussion. Bancroft's History of the Constitution, vol. 2, ch. 10.

In the early days of the Republic, an assumption by the courts of the right to invalidate acts of the Legislature was bitterly resented. The judges of Rhode Island and of Ohio were impeached for assuming such power, and those of Virginia resigned under a storm of censure on account of like conduct. Not until the decision of the Supreme Court of the United States in *Marbury v. Madison* ( 1 Cranch, 51) did the controversy over the disputed question begin to abate; but Chief Justice Marshall, who in that case affirmed the existence of the power, had some years previously, as counsel in the case of *Ware v. Hylton* ( 3 Dallas, 211), declared:

"The legislative authority of any country can only be restrained by its own municipal constitution; this is a principle that springs from the very nature of society; *and the judicial authority can have no right to question*

25—58 KAN.

*the validity of a law, unless such a jurisdiction is expressly given by the Constitution.''*

That such jurisdiction is expressly given by the Federal Constitution, or by the constitutions of the states generally, will hardly be asserted. But, "as if increase of appetite had grown by what it fed on," one assumption of power by the courts has but given courage and capacity for another, until from a hesitating, apologetic refusal to effectuate legislative acts clearly violative of constitutional right, we have grown to arrogate the prerogative of controlling executive acts, settling questions of legislative membership, condemning forms of legislative procedure, enjoining the enforcement of legislative provisions, marking out the scope and policy of legislative inquiries, and, generally, of directing the plan and supervising the machinery of political government. So far as I am concerned, I shall refuse to join in any assumption of constitutional jurisdiction beyond those boundaries which are already defined, defended by impregnable walls of precedent, and yielded over as undisputed ground.

The first and principal act of municipal control is the making of laws. Leaving out of view, for the moment, the people in their primary capacity as the fountain of authority, and looking only at the source from which it directly and proximately proceeds, it is inevitably perceived that power resides in the legislative body alone ; and, furthermore, that in a natural sense it is the only tribunal to which primary power has been or can be confided. As a depositary of delegated authority, the Legislature is the only logical and necessary provision of nature in its bearing upon the government of men. All other powers are of secondary delegation from it. Governors and judges are but creatures of legislative fashioning and executioners

of legislative will. In a social economy determined upon principles of natural law there is no provision for executive or judicial office. It is only because municipal law cannot be made self-executing — only because the subjects of municipal law do not always yield that ready obedience necessary to an orderly social state — that the legislative will must needs create an agency for its vindication; and this is all it does create, and these are all the powers that do exist — legislative and executive. Among the divisions of government, analytically considered, there is no such thing as judicial power. What we call by that name is merely a function of executive power.

"It has been customary to consider government under three distinct general heads; the legislative, the executive and the judicial. But, if we permit our judgment to act unencumbered by the habit of multiplied terms, we can perceive no more than two divisions of power of which civil government is composed, namely, that of legislating or enacting laws, and that of executing or administering them. Everthing, therefore, appertaining to civil government classes itself under one or other of these two divisions. So far as regards the execution of laws, that which is called the judicial power is strictly and properly the executive power of every country. It is that power to which every individual has an appeal, and which causes the laws to be executed." Paine's Rights of Man, part II, ch. 4.

Courts are but instrumentalities of executive power. Except as arbitrarily created, they constitute no separate department of the political state; and the work of defining the law, in the process and to the end of its execution, is as much the exercise of executive power as the delivery of the blow, with the fashioned and completed instrument, by the executive arm and in vindication of the executive right. In the domain of municipal law, as in everything else, we may sub-

divide and classify, and invent names for things; we may enlarge or restrict powers; but we can no more change the essential attributes of the parts of government than we can make over or give new direction to the elements of physical nature.

Let it be understood that the binding force of the divisions of power made by the Constitution is recognized. Attention is called to the essential nature of the power, as it existed before and lies back of the artificial classification made, only for the purpose of aiding to a construction of its terms.

I do not believe it was the intention of the masters of political science who framed and set in motion the machinery of this Government to disregard the fundamental character of legislative and executive power, and of judicial power, so called, and invert the order of nature by elevating the agent above the principal, the creature above the creator, and magnify a mere function of one of the parts of the system into the life and dominance of the system itself.

We are not left, however, to the necessity of reasoning upon questions of fundamental principle to determine the case in hand. What is said above is only to indicate the base out of which grows the deep-seated aversion I have to attempts by the courts at the nullification of the popular will as expressed by the representative assembly. It is no justification of such attempts that much of legislative action is awkward, stupid, extravagant, useless, or positively corrupt and vicious. We are invested with no power of correction of the education, manners, or morals of the legislative branch. The people, in their sovereign capacity, have conferred upon that branch legislative power; and whatever that is it may freely exercise. What is legislative power? Primarily and principally, it is the power to declare rules of action for the govern-

ment of the constituency, and, incidentally, to acquire information necessary to the discharge of its duties, and to adopt and enforce rules of procedure in the conduct of its business. How and when may this power be exercised? Marshall, in *Ware v. Hylton*, supra, said : '' The legislative authority of any country can only be restrained by its own municipal constitution. This is a principle that springs from the very nature of society.'' Multiplied decisions of courts and sayings of jurists might be quoted to the same import. All of them affirm that legislative power is supreme except as limited by the organic law. How may it be thus limited by such law ? There is not a claim in American jurisprudence that it can be otherwise limited than by express prohibition, grants to other co-ordinate branches, reservations to the people themselves, or necessary implications flowing from such prohibition, grants and reservations. Has the authority to do the acts of which the petitioner complains been expressly prohibited by the Constitution? Such is not claimed to be the case. Has it been granted to another department? Neither is such claimed to be the case. Has it been reserved to the people themselves? Nor is such claimed to be the case. What then is the prohibition, grant, or reservation from which the implication of lack of power is derived?

In the opinion of the majority of the court, there is an emphasis of assertion that the power to imprison is judicial in its nature ; that it is not to be lightly implied, but must exist in concrete and defined expression. No attempt is made, however, to point out the specific constitutional provision which, through its implications, prevents the general grant of legislative power from authorizing imprisonment in this or any other like class of cases. It may well be conceded that the statutory enactment under which a power to

imprison is derived should be expressed in positive and unambiguous terms. We are concerned, however, with no question of statutory construction, but with one of existence of constitutional power. From the general grant of legislative power proceeds the right to enact statutes for the imprisonment of all classes of offenders; the very authority which courts have to imprison for contempt proceeds from it, in most cases, and can be traced to no other source. What, I ask again, is that constitutional provision which, through its necessary implications, restricts this legislative power from authorizing imprisonment in one case while conferring it in another?

The gravamen of Mr. Justice Allen's decision is, that the witness cannot be punished as for a contempt of legislative authority, because the Legislature is not in session and therefore does not exist as an object of contempt; and that the statute of 1891, which assumes to vest legislative committees sitting beyond the legislative session with power to punish for contempt, is ineffectual, as being an attempted delegation of legislative power. This view is predicated on the assumption that, upon the close of a legislative session, the power to perform all acts legislative in character ceases; that no power which the Legislature, sitting as a joint body, or which either house sitting separately, is qualified to exercise, can thereafter be exercised in its or their behalf; that is, to quote that language of the opinion which to me is quite indefinite, "no power of final action and decision" can be so performed. I understand the right of a legislative body to order an investigation, through an appropriate committee, into matters legislative in character, at a time beyond the legislative session, to be conceded; but understand the power of the Legislature to put any effective means in the hands of such committee to

attain the desired end, to be denied; that is, a legislature may investigate, at such time and by such committee, if the subjects of investigation shall be pleased to allow the inquisition. In other words, the tribunal may be duly ordered and organized; it may sit, if riotous disturbers will tolerate its sessions; it may subpœna witnesses, if its officers choose to serve its process; and it may hear testimony, if such witnesses choose to attend; but it can command obedience from no one in its efforts to discharge its trust, and is entitled to no respect in its character as an official body. The illustrations thus given of the claimed impotence of such committee are not borrowed from the field of extremes. They state the exact view of the majority of the court.

This novel doctrine, we are told, is extracted out of the principle that legislative power cannot be delegated; that, while either house may punish for contempt, it cannot authorize its committees, intrusted with the performance of its business, to do so. The inability of a legislative body to abdicate the duty imposed upon it of making laws — that is, general rules of action for the government of the constituency — and to impose such duty upon another body or tribunal or to relegate it back to the people, is conceded, so far as the refusal of judicial authority to sanction such action is concerned; and it is not necessary here to discuss the fundamental soundness of such doctrine. I know, however, of no authorities which have gone farther, or stated the doctrine in broader terms, than to simply say that the legislature cannot delegate its power to *make laws.* "The legislature neither must nor can transfer the power of *making laws* to any body else, nor place it anywhere but where the people have." Locke on Civil Government, § 142. "One of the settled maxims in constitutional law is, that the power

conferred upon the legislature to *make laws* cannot be delegated by that department to any other body or authority." Cooley on Constitutional Limitations, (6th ed.), 137. "It is a general principle of constitutional law that the power conferred upon the legislature by the constitution to *make laws* cannot be delegated by that body to any other person or authority." Black's Constitutional Law, § 105, page 279.

The doctrine that legislative power cannot be delegated has never been invoked to nullify acts in abdication of legislative sovereignty, save in the case of attempts to transfer to another the right to enact laws. To the majority of this court, however, belongs the bold distinction of applying it to the defeat of the legislative will in its endeavor to procure information concerning matters vital to the integrity of the legislative branch and to the interests and honor of the State.

It is not necessary for me to assert that the incidental legislative authority to punish for contempt may be delegated to another tribunal and be exercised by it as legislative power. It is sufficient for my purpose to point out the fact that the rule invoked in this case is the rule that the power to *make laws* cannot be delegated, and that heretofore no court has applied it farther than as thus stated.

But I assert that the power conferred by the concurrent resolution in question, in connection with the statute of 1891, is judicial in its nature, and may be rightfully exercised because of such fact. The recent decisions, *In re Huron* (ante, p. 152), and *In re Sims* (54 Kan. 1), are not in point against such view. In the Huron case, it was held that a notary public could not receive a grant of power to punish for contempt; but such decision was rested upon the ground that a notary's office was not judicial in its nature, and that a notary public was not a "court," in the sense in

which that term is used in the provision of the Constitution which allows the creation of "courts inferior to the supreme court"; that, except when a tribunal is created which rises to the dignity and is invested with the character of a court, the high judicial prerogative of imprisoning for contempt cannot be exercised; that the judicial power to punish for contempt cannot be vested as a mere incident to duties purely executive or ministerial. The same view influenced the decision in *In re Sims*, supra, with the added consideration that the power there sought to be conferred was blended with the incompatible functions of an executive office. The case before us now is entirely different. Here, a court is created in the fullest sense of the term. There is not an element lacking in it so far as organization and subject-matter of jurisdiction are concerned. A tribunal is designated to be composed of five persons; authority is given to appoint an officer to serve process, a stenographer to note and transcribe testimony, and a clerk to make and preserve a record of proceedings. A subject-matter of inquiry is likewise stated and defined. That subject-matter is of vital public concern. The very organization and object of this tribunal implies a power to proceed in its labors according to formal and deliberative rules; to hear evidence, to determine the competency of witnesses, the admissibility of testimony, together with its weight and credibility, and to report its findings and judgment. True, there is no special direction to the committee to make a report, but that is necessarily implied from the purpose of its appointment and its power to sit. The power to "investigate" carries with it the power to publish the result of the investigation. Nor is the failure to designate some one to whom the report is to be made, fatal to the power to proceed under the resolution and law. A claim of

such character was briefly argued on the hearing, and is faintly shadowed forth in the opinion of the majority of the court; but I do not understand it to be made, even in part, a determining feature of the case. However, without troubling myself to find a specific depositary for such report, I apprehend one can be found among the many legal custodians of public documents and records. But if it were otherwise, I deny the right of this court to invalidate the resolution in question because no officer or tribunal is designated as the depositary of the committee's report.

That the Legislature ought to have manifested a specific and sensible design by, in terms, directing the making and filing of a report, may be conceded; but to rest a claim of constitutional invalidity of its action upon its failure to give such direction, would be a most unwarranted extension of judicial prerogative. I assert it to be entirely competent for the Legislature to direct an investigation into a matter of public concern, solely for public information, and with no other object in view than the dissemination of such information through the public prints. Without elaborating farther, I only care to say that the precise question here involved, as I view it, was determined by the Supreme Court of New York in the case of the *People v. Learned*, 5 Hun, 626. The syllabus to that case reads as follows :

" In March, 1875, a commission was created by concurrent resolution of Senate and Assembly, to investigate the affairs of the canals of this State. Upon the hearing of an application for the discharge of a person committed by the commission for contempt in refusing to produce before it certain books and papers, it was insisted that such a commission could only be created by bill enacted by both branches of the Legislature and signed by the Governor. *Held*, that there was no clause in the Constitution expressly prohibiting the creation of a commission by concurrent reso-

lution; and that, when not expressly prohibited, the legislative power was unrestricted and unlimited.

"The act (chapter 91, Laws of 1875) provided, that in case of the refusal of a witness to obey the subpœna, he should be brought before the commission by attachment, and that 'the like proceeding shall hereupon be had as if such commission was a court of record and such witness had been duly subpœnaed to attend before it.' *Held, first,* that the act was not in conflict with the constitutional provision declaring that no person shall be deprived of life, liberty, or property without due process of law; *second,* that the act was not in conflict with section 17 of article 3 of amended Constitution, providing that no act shall be passed which shall enact that any existing law shall be deemed a part of, or applicable to, the said act, except by inserting it therein; *third,* that the said commission was empowered to issue subpœnas to enforce the attendance of witnesses and to compel the production of books and papers, and to adjudge any person willfully refusing to produce such books and papers guilty of contempt and commit him therefor."

The statements of law thus made are satisfactory to me, and I think should control the decision in this case.

But it is said that the case cited differs in a material respect from the one under consideration. That difference, we are told, consists in the fact that, while in both cases the committee was appointed under legislative resolution, and not by statute, yet, in New York, the power to commit for contempt was conferred by special act, passed at the same session, and applying to such committee alone; while with us, the power is conferred by a general law, passed some years ago, and applying to all committees then or thereafter to be appointed. In other words, the exercise of the power is made to depend upon whether the act in question is special or general. The Legislature may empower one committee, but not more than one.

It may empower such committee as may be appointed at the same session, but none to be thereafter appointed. I do not unfairly state the reasoning of the majority of the court in its effort to distinguish the two cases. I have but reduced it to its final analysis.

If the essential soundness of the decision in the *People v. Learned* be not denied, and I do not understand that it is, it applies to this case. There is absolutely no difference between it and the present case, either in point of fact or principle.

But it is urged, against the view taken of the judicial nature of the powers conferred upon the committee, that it cannot be regarded as a court, because under the constitution "courts" can only be "provided by law"; that is, by bill, with title, enacting clause, formal enactment and executive approval; whereas this committee was authorized by resolution only. The attempt to draw this distinction is a shifting of the real ground of contention. The question is not how the members of the committee may be designated, nor how the subject-matter of their inquiry may be pointed out to them, but in what manner the judicial power to issue compulsory process and to compel the giving of testimony may be conferred. That the Legislature is powerless to confer upon one of its committees, by formal statutory enactment the judicial authority to summon witnesses and punish for contempt, simply because it had not by another formal statutory enactment authorized the appointment of such committee, is refining upon the constitutional powers of that body to a high degree indeed.

But this committee, or court, was "provided by law"; that is, its powers were provided by law, and that is what the Constitution means. That the appointment of committees such as the one in question, and the designation of a subject-matter of inquiry, by

concurrent resolution, is an appropriate and constitutional exercise of power, is not denied; in fact, is conceded, as I understand. So far so good. The "court," then, was "provided by law," as to composition and subject-matter of jurisdiction. Nothing, therefore, remained to be done but to confer upon it the high judicial prerogative of compelling obedience to its orders. That was done in the very way required by the majority of this court. It was done by "law," using the term in its narrow and most technical sense. It was done by the statute of 1891 — an enactment possessing all the requisites of constitutional formality. But, in a broader sense than this, the "court" in question was "provided by law." The Legislature, by the act of 1891, declared that such legislative investigating committees as might thereafter be appointed should possess the judicial power to issue compulsory process and punish for contempt. It declared that when such committees were appointed they should be courts. It validated their existence in advance of their creation. It in fact authorized their appointment, and made ready to their hands the machinery of judicial power when they should be called into being. It therefore provided them by law. There is, in my judgment, no merit in the petitioner's contention, and he ought to be remanded into custody and be dealt with for his contempt of the committee's order.